1
2
3
4
5
6
7
8
9
10

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NATIONAL FIRE INSURANCE COMPANY OF HARTFORD as successor by merger to TRANSCONTINENTAL INSURANCE COMPANY AND AMERICAN CASUALTY COMPANY OF READING, PA,** | **07-CV-01056-AWI-GSA** |
| **Plaintiffs,** | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | (Documents # 30 & 31) |
| **ADOLPH MARTINELLI, JR., AND CLAUDIA SUE STEINHAUER,** | |
| **Defendants.** | |
| **AND RELATED COUNTER-CLAIMS** | |

11
12
13
14
15
16
17
18
19
20
21
22        This case comes before the Court on Plaintiffs' / Counter-Defendants' motion for

23   summary judgment.  Plaintiffs / Counter-Defendants are the Transcontinental Insurance

24   Company ("Transcontinental"), the American Casualty Company of Reading, PA ("American

25   Casualty") and their successor by merger, the National Fire Insurance Company of Hartford

26   ("National Fire") (collectively as "Plaintiffs").  Defendants / Counter-Claimants are

27   Adolph Martinelli, Jr. ("Martinelli") and Claudia Sue Steinhauer ("Steinhauer") (collectively as

28   "Defendants").  Plaintiffs seek summary judgment on their complaint against Defendants for

declaratory relief and summary judgment in their favor on Defendants' counter-claim.  For the reasons that follow, the motion for summary judgment will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On or around May 13, 2003, in Madera, California, the levee of a process pond owned by the California Olive Growers ("COG") failed and flooded neighboring property with approximately 60 acre feet of salt-water/brine wastewater.  The wastewater inundated approximately 40 acres of olive orchards belonging to Defendant Martinelli and approximately 40 acres of grape vineyards belonging to Defendant Steinhauer.  The high concentration of salinity levels in the wastewater damaged or killed Defendants' olive trees and grape vines, respectively, substantially reduced or completely eradicated their crop yield, and contaminated the soil of their parcels.

The failure of the levee was a result of COG's negligent failure to properly inspect and maintain the process pond.  Accordingly, Defendants filed a complaint against COG in the Superior Court of California, County of Madera (Case No. MCV023703).[1]  They filed an amended complaint on October 6, 2004, seeking damages in the amount of $8.25 million.

At the time of the property damage, COG was insured by a Transcontinental commercial general liability policy and an American Casualty commercial umbrella policy.  Plaintiffs denied COG's claims, however, maintaining that the specific type of property damage was not covered under the policies.  Defendants eventually obtained a default judgment in their Superior Court action against COG on May 4, 2007 for $70,133,636, the alleged amount of the total damage to their property, and COG subsequently declared Chapter 11 bankruptcy in December 2004 (later converted to Chapter 7 bankruptcy).

On July 24, 2007, Transcontinental and American Casualty filed a complaint against

---

[1] Per Plaintiffs' Request (Doc. 33), the Court takes judicial notice of the state court's proceedings in that action.

Defendants in this Court seeking declaratory relief.  Transcontinental and American Casualty asked the Court for a declaration that (1) COG's policies provide no coverage for the type of property damage that occurred, (2) COG owe no obligations to the underlying claims or judgment, and (3) Defendants have no rights of recovery against Transcontinental or American Casualty.

On October 1, 2007, Defendants filed a counter-claim against Transcontinental and American Casualty.  Defendants argued that Transcontinental and American Casualty owe them duties and obligations as judgment creditors and third-party beneficiaries under COG's policies. As such, they brought counter-claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) direct action for recovery of a judgment under California Insurance Code § 11580, as judgment creditors.

In response, Transcontinental and American Casualty filed motions to dismiss each of the counter-claims for failure to state a claim upon which relief may be granted, under Federal Rule of Civil Procedure 12(b)(6).  Transcontinental and American Casualty argued that the counter-claims for breach of contract and breach of the implied covenant of good faith and fair dealing must be dismissed because Defendants are neither parties to the contracts that were allegedly breached or that contain the covenant, respectively, nor assignees of rights under the contracts and thus lack standing.  Transcontinental and American Casualty argued that the counter-claim for recovery of the judgment must be dismissed because the judgment that forms the basis of the claim for relief is void.  On January 10, 2008, this Court denied the motions to dismiss the counter-claims for breach of contract and breach of the implied covenant of good faith and fair dealing to the extent the counter-claims touched on Transcontinental's and American Casualty's post-judgment conduct toward Defendants.  The Court denied the motion to dismiss the counter-claim for recovery of the judgment to the extent the judgement sought to be recovered does not exceed $8.25 million, the amount sought by Defendants.

Plaintiffs filed the present motion for summary judgment against Defendants on May 30,

2008.  Plaintiffs seek summary judgment against Defendants on their complaint and on the

counter-claim.  Plaintiffs argue that both the Transcontinental and American Casualty policies

held by COG contain a "pollution exclusion," which specifically bars coverage of claims like the

one at issue here.  Thus the Court should grant summary judgment on the complaint, thereby

determining for Plaintiffs that the insurance policies provide no coverage to COG's claim.

Plaintiffs further argue that the Court, in turn, should also grant summary judgment on the

counter-claim in favor of Plaintiffs because lack of coverage is a complete defense to each cause

of action brought by Defendants.

Defendants filed an opposition to the motion on June 16, 2008.  Plaintiffs filed a reply on

June 23, 2008.

Plaintiffs served Defendants with a Request for Admissions containing only two requests:

(1) that the pollution exclusion in the Transcontinental policy excludes coverage for the

underlying claim; and (2) that the pollution exclusion in the American Casualty policy excludes

coverage for the underlying claim.  On March 10, 2008, Defendants responded to both requests

with a denial.

### **LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

case turns on a mixed question of law and fact and the only dispute relates to the legal

significance of the undisputed facts, the controversy for trial collapses into a question of law that

4

1  is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

2  1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the
> initial responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

circumstance, summary judgment should be granted, "so long as whatever is before the district

court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

satisfied."  Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has

no obligation to produce anything, even if the non-moving party would have the ultimate burden

of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d

at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles,

607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the

suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.

2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c); Fortyune, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (internal citations omitted).  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

## **DISCUSSION**

Both parties in this case submitted a Statement of Undisputed Facts.  After examining the record, the Court has determined that the relevant undisputed material facts are as follows:

### A.    **Undisputed Material Facts**

1.    On or about May 13, 2003, approximately 60 acre feet of salt-water/brine wastewater from a COG process pond flooded approximately 40 acres of Martinelli's olive orchard and approximately 40 acres of Steinhauer's

grape vineyard.

2.        The flooding was caused by a failure of the levee enclosing the process pond.  The rupture in the levee was a result of COG's negligent failure to properly inspect or maintain the process pond.

3.        At the time of the damage, COG held a liability insurance policy issued by Transcontinental and an umbrella insurance policy issued by American Casualty.  COG filed a claim reporting the damage on or about June 3, 2003.

4.        The insurance companies rejected COG's claim on the basis that the policies' contain a pollution exclusion, which they maintain precludes coverage of the specific type of damage.

5.        On or about June 24, 2004, Defendants filed a state action against COG for damage to their property.  On or about October 22, 2004, Defendants obtained a default judgment against COG for $70,133,636, the alleged amount of the total damage to their property.  On or about December 15, 2004, COG filed for bankruptcy.

6.        Defendants proceeded to file a counter-claim against Plaintiffs on October 1, 2007.  On January 10, 2008, this Court denied Plaintiffs' motions to dismiss Defendants' claims and determined that Defendants properly brought the claims as judgment creditors against the insurers and third-party beneficiaries of the insurance policies.

**B.**    **Insurance Policy Terms**

As described above, neither party disputes the facts surrounding the property damage — how the damage occurred, that there was indeed considerable property damage, or even that COG was insured by Plaintiffs.  The only material dispute in this matter is whether COG's

insurance policies provide coverage for the damage.  If the policies are found to exclude coverage of the property damage, then it follows that Plaintiffs may not be held liable for those damages or for the causes of action in Defendants' counter-claim, and so summary judgment should be granted as sought by Plaintiffs.  On the other hand, if the insurance policies are found to cover the damage at issue, then Plaintiffs will be held liable for COG's claim, and Defendants will succeed on their counter-claim, and so Plaintiff's summary judgment should be denied as to all relief requested.  The disposition of this case will turn on the applicability of the insurance policies.  "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*."  American Cas. Co. of Reading, Pa. v. Miller, 71 Cal. Rptr. 3d 571, 574 (Ct. App. 2008).

The dispositive question is whether the pollution exclusion in COG's insurance policies applies to exclude the damage caused by the flooding of the salt-water/brine.  This is not a factual question; interpretation of insurance policy language is a question of law.  MacKinnon v. Truck Ins. Exchange, 31 Cal. 4th 635, 641 (2003).  Thus it may be appropriately decided in a motion for summary judgment.  The determination whether the insurer is liable is made by comparing the factual circumstances with the terms of the policy.  Montrose Chemical Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993).

To make that determination, the Court must examine the coverage language of the policies in this case.  The interpretation of policy terms follows the general rules of contract interpretation.  MacKinnon, 31 Cal. 4th at 647.

The Transcontinental policy states, in relevant part:

This insurance does not apply to:

f.    Pollution

(1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a)    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured . . .

* * *

      (b)     At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

      (c)     Which are or were at any time transported, handled, stored, treated, disposed of, or processed a waste by or for

             (i)     any insured; or

             (ii)     any person or organization for whom you may be legally responsible; or

* * *

(2)     Any loss, cost or expense arising out of any:

      (a)     Request, demand, order or statutory or regulatory requirement that any isured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

* * *

15.     "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

Ex. 17A.[2]

The American Casualty policy contains nearly identical language, in relevant part:

This insurance does not apply to:

(1)     "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

      (a)     At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any isured;

      (b)     At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

      (c)     Which are or were at any time transported, handled, stored, treated, disposed of, or processed a waste by or for any insured or any person or

---

[2] Unless otherwise stated, any citation to an Exhibit refers to an exhibit from Plaintiffs' Evidentiary Packet (Doc. # 34) submitted in support of their motion for summary judgment.

1                organization for whom you may be legally responsible; or

2                                     * * *

3      (2)     Any loss, cost or expense arising out of any:

4             (a)     Request, demand, order or statutory or regulatory requirement that any isured or others test for, monitor, clean up, remove, contain, treat, detoxify

5                      or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

6                              * * *

7

8      "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

9

10 Ex. 17B.

11      More importantly, the language in these policies is materially identical to the standard

12 pollution exclusion clauses typically included in all commercial general liability ("CGL")

13 policies issued to businesses.  See, e.g., Travelers Cas. & Sur. Co. v. Superior Court, 75 Cal.

14 Rptr. 2d 54 (Ct. App. 1998).  Therefore, to understand the meaning of these particular

15 exclusions, it would be helpful to consider how courts have historically treated pollution

16 exclusions.

17

18                **1.**     **Pollution Exclusion Clauses Under California Law**

19      As this is a diversity action, the Court must look to California law to determine how

20 pollution exclusions in insurance policies are interpreted and have been applied under similar

21 circumstances in the past.  Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).  The seminal case on

22 the issue in this state is the California Supreme Court decision in MacKinnon v. Truck Insurance

23 Exchange, 31 Cal. 4th 635 (2003).

24      In MacKinnon, a tenant in MacKinnon's apartment building requested that he

25 exterminate yellow jacket insects found at the building.  After MacKinnon had the building

26 treated with pesticide to exterminate the insects, the tenant died in her apartment.  The tenant's

27 parents filed suit against MacKinnon and the parties eventually agreed to settle the action.

28                                     11

MacKinnon then filed the claim with his insurance provider, who denied coverage on the ground that the incident fell under his policy's pollution exclusion.  Hence, the question before the court was whether a standard pollution exclusion clause applied to exclude coverage of an injury caused by a landlord's negligent use of pesticides on his property.  The court concluded that the clause did not exclude coverage of the injury because the language did not plainly and clearly exclude ordinary acts of negligence involving toxic chemicals such as pesticides.  Id. at 639-641.

The court in MacKinnon acknowledged that, up to that point, California courts had no clear or consistent position on how to interpret pollution exclusion clauses.  In order to come to one, the court recounted the detailed history of the evolution of the pollution exclusion.  See Id. at 643-644; (citing American States Ins. Co. v. Koloms, 177 Ill.2d 473 (1997)).  The clause was designed to encourage the insured to take precautions against contaminating the environment. The first version was adopted by the insurance industry and added to the standard-form CGL policy in 1970.  That version contained language stating that "this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."  The "sudden and accidental" exception to the exclusion was heavily litigated, however, and led the industry to revise the language in 1985 to its current form — often referred to as the "absolute pollution exclusion."  The new version excised the "sudden and accidental" exception and eliminated the requirement that the pollution be discharged "into or upon land, the atmosphere or any watercourse or body of water."  Id. at 644.

MacKinnon also identified the two general approaches that courts in this country take with regard to interpreting the current pollution exclusion.  Id. at 641-642.  "One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur in the normal course of business . . . .  The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution and that the clause is as unambiguous in excluding the former as the latter."  Id.  After considering the

history and purpose of the clause and evaluating it with the relevant principles of contract interpretation, the court decidedly put California in the first camp with the narrower interpretation of the pollution exclusion.

The court followed the principle of California law that "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer.  Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language."  Id. at 648 (internal citations omitted).  The insurance company argued that the incident fell under the scope of the exclusion because pesticides are "chemicals" capable of causing irritation and can therefore be defined as an "irritant" and a "pollutant," and the spraying of pesticides is a "discharge" or "dispersal."  But the court found that interpretation to be an unreasonable over-reliance on dictionary definitions.  In general, the court insisted that the interpretation of the exclusionary language must not lead to "absurd results," ignore "familiar connotations of the words used in the exclusion," or be out of line with "the interpretation that the ordinary layperson would adopt."  Id. at 652.

More specifically, instead of relying on vague definitions that would encompass virtually any substance, the court gleaned three pertinent guiding principles from the exclusionary language:

First, the policy's terms "discharge," "dispersal," "release" or "escape" connote some sort of *unintentional freedom from containment*.  In MacKinnon's case, the spraying of pesticide did not qualify because it was an intentional application.

Second, the *magnitude* of the "discharge," "dispersal," "release" or "escape" is important. The language implies that the spreading of the pollution must be a substantial dissemination, wide enough to cause its dissipation and dilution.  In MacKinnon's case, arguing that the localized application of pesticide in and around an apartment building falls under that intended meaning of "discharge," "dispersal," "release" or "escape" strains the common understanding of

those terms.

Third, a "pollutant," "irritant" or "contaminant" is considered an "impurity, something objectionable and unwanted," but the interpretation of the terms must be read as  including only those substances that are *commonly thought of as pollution*, i.e. environmental pollution, not every possible "pollutant," "irritant" or "contaminant" imaginable.  The court held that pesticide used to kill yellow jackets at an apartment building was not commonly understood to be a pollutant or pollution and thus was not excluded from coverage.  Of course, one can conceive of situations in which pesticide *could* be commonly thought of as pollution.  Acknowledging that reality, the court stressed that any interpretation of these terms must be contextual; so that the same substance may or may not be pollution, depending entirely on the circumstances.  Id. at 654 ("While pesticides may be pollutants under some circumstances, it is unlikely a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution.").

Hence, the test in MacKinnon is based "upon the type of pollutant and how it is released into the environment."  Miller, 71 Cal. Rptr. 3d at 581.


**2.     Relevance of MacKinnon and Its Progeny**

There is no doubt that MacKinnon controls in the present case.  The legal question before this Court is materially the same — whether a standard pollution exclusion clause applies to exclude coverage of an injury caused by an insured's negligent maintenance of salt-water/brine on his property; the language of the exclusion clause is the same; and the principles of California law that this Court must follow are the same.  However, because the specific facts in MacKinnon are less than perfectly analogous here, it is instructive to consider California cases interpreting pollution exclusions after MacKinnon.

In Garamendi v. Golden Eagle Ins. Co., 25 Cal. Rptr. 3d 642 (Ct. App. 2005), the court considered whether the release of silica-containing dust into the air fell under the pollution

exclusion clause of a CGL insurance policy.  Despite the fact that silica "is found in many commonplace materials such as sand, glass, concrete and computer chips," the court held that "the widespread dissemination of silica dust as an incident by-product of industrial sandblasting operations most assuredly is what is 'commonly thought of as pollution' and environmental pollution.'"  Id. at 646 (quoting MacKinnon).

In Ortega Rock Quarry v. Golden Eagle Ins. Corp., 46 Cal. Rptr. 3d 517, (App. Ct. 2006), the Ortega Rock Quarry placed fill dirt and rocks along a washed out access road.  The fill along the road resulted in the discharge of the fill dirt and rocks into the Lucas Canyon Creek.  Ortega's lessor filed suit against Ortega, alleging that Ortega had damaged the creek and surrounding property.  Ortega submitted the claim to its insurers, but the insurance company denied the claim, asserting that rocks and dirt were "pollutants" subject to the pollution exclusion.  The court agreed, noting that dirt and rocks were considered pollutants within the meaning of the Clean Water Act, and rejected Ortega's assertion that because dirt and rocks are naturally occurring, they are not pollutants.

In Cold Creek Compost, Inc. v. State Farm Fire and Cas. Co., 68 Cal. Rptr. 3d 216 (Ct. App. 2008), plaintiffs filed an action for injunctive relief against Cold Creek, a compost operator. The complaint stated that the composting operations emitted, among other things, "foul and noxious odors."  Relying on MacKinnon, the court held that the odor was indeed "pollution" under the pollution exclusion in Cold Creek's insurance policy:

> The odors emanating from Cold Creek's facility were unquestionably an "impurity, something objectionable and unwanted" [quoting MacKinnon] in the air where the . . . plaintiffs lived; the odors "polluted" the air, as the term "pollute" is commonly understood.  In the ordinary and popular sense of the words of the pollution exclusion, the odors were "discharged" and "released" by the composting and "escaped" from the facility.  The odors spread a mile and a half to the plaintiffs' homes—a "substantial dissemination" to the point of "dissipation and dilution" ordinarily understood as a "dispersal of pollutants" into the environment.  The . . . plaintiffs did not suffer a "localized toxic accident" like the one in MacKinnon; they were harmed by a persistent by-product of Cold Creek's business operations, what MacKinnon called "traditional environmental industrial pollution."

Id. at 224.  Cold Creek argued that the compost odors were not pollutants because they posed no

1  significant health threats and caused no injuries, but the court held that in California, "a

2  substance need not be toxic or particularly harmful to be considered a pollutant under the

3  pollution exclusion.

4       In American Casualty Co. of Reading, Pa. v. Miller, 71 Cal. Rptr. 3d 571, a worker in the

5  public sewer system was injured when a furniture stripping company released methylene chloride

6  into the sewer where he was working.  The court determined that "an ordinary insured standing

7  in [the defendant's] shoes," as well as a "layperson would reasonably understand that the release

8  of methylene chloride into a public sewer is a form of environmental degradation . . . not

9  analogous to the normal, intentional application of pesticides in an apartment building."  Id. at

10  581.  Thus the pollution exclusion excluded coverage of the injury.

11

12                    **3.        Application of California Law to Present Case**

13       The decisions in MacKinnon and its progeny support Plaintiffs here.

14       The release of the wastewater in this case was not intentional or deliberately applied, as

15  was the pesticide in MacKinnon.  As the levee broke and the enormous amount of wastewater

16  stored in the process pond flooded out onto neighboring property, there was quite literally an

17  unintentional "freedom from containment," MacKinnon, 31 Cal. 4th at 651.  Under the

18  MacKinnon analysis, there is no question this constituted actual "discharge, dispersal, . . . release

19  or escape."

20       Moreover, the nature of the dispersal is also telling.  The pesticide in MacKinnon was

21  applied in a localized area, in and around an apartment building, the vicinity of its intended use.

22  In this case, the wastewater spread out over approximately 80 acres of Defendants' property.  The

23  fact of the  "substantial dissemination" of the saltwater reinforces that the incident falls under the

24  common understanding of a "dispersal," especially under California's interpretation of the

25  language.

26       Thus the determination of whether the insurance policies cover the property damage in

27

28                                                16

this case or whether the pollution exclusion excludes it turns on whether the saltwater/brine was a "pollutant." That is, whether it could be "commonly thought of as pollution" under the circumstances or "environmental pollution." Id. at 653.

Like Defendants, this Court has been unable to locate any reported California case involving saltwater and a pollution exclusion clause. But this is not determinative. A United States district court in Texas dealt with a similar issue in American Equity Ins. Co. v. Castlemane Farms, Inc., 220 F. Supp. 2d 809 (S.D. Tex. 2002). In that case, property damage caused by the rupture of a landscaping company's saltwater disposal pipeline fell within the pollution exclusion of the company's CGL policy. Despite the company's contention that saltwater discharge was not a "pollutant," the court found saltwater to be a "contaminant" when introduced accidentally onto property not meant to receive it. Of course, that case is not binding upon this Court, but it is persuasive.

Plaintiffs have submitted a number of documents from the California Regional Water Quality Control Board, Central Valley Region, in which the saltwater in COG's process pond is referred to as "wastewater" (Exs. 3-13) and even classified as "designated waste" (Ex. 3). This classification is not legally conclusive for insurance purposes and it is not binding upon this Court. However, as an environmental classification from a state agency, it is also persuasive. California courts evaluating pollution exclusions recognize that "state and federal environmental laws may provide insight into the scope of the policies' definition of pollutants without being specifically incorporated in those definitions." Ortega Rock Quarry, 46 Cal. Rptr. 3d at 525 (referring to 33 U.S.C. § 1362(6), which includes dirt and rocks as pollutants in the Clean Water Act); see also Garamendi, 25 Cal. Rptr. 3d at 646 (referring to 29 C.F.R. § 1910.1000, which identifies silica dust as an "air contaminant").

Defendants argue that a reasonable insured would not consider salt water a pollutant as defined in the policy because "[i]t is not chemical, toxic, or a hazardous waste." But this too is not determinative. As explained above, a California court of appeals in Cold Creek Compost,

Inc. found offensive odors to be a "pollutant" under the standard pollution exclusion because "a substance need not be toxic or particularly harmful to be considered a pollutant under the pollution exclusion." Cold Creek Compost, Inc., 68 Cal. Rptr. 3d at 226. Even the fact that saltwater is "natural" is not determinative that it is not a "pollutant." In Ortega Rock Quarry, 46 Cal. Rptr. 3d at 525, "natural" dirt and rocks were deemed pollutants when they damaged the creek. Both the Cold Creek Compost, Inc. odors and the Ortega Rock Quarry rocks and dirt were "an impurity, something objectionable and unwanted" that "polluted" the air and water, respectively. Cold Creek Compost, Inc., 68 Cal. Rptr. 3d at 224. To olive trees and grapevines, a massive amount of saltwater too is "an impurity, something objectionable and unwanted" that pollutes the crops and the soil they grow in, regardless of whether it is chemical, toxic or a hazardous waste, or even natural.

Defendants raise a number of hypothetical situations involving saltwater to demonstrate that declaring saltwater a "pollutant" for insurance purposes would lead to absurd and possibly even disastrous results for many California insureds: while saltwater harms crops, they point out, even plain water can harm crops when it floods; storm surges and high tides in California's coastal areas could cause damage to homes and property; and saltwater based swimming pools could leak and damage neighbors' property. What Defendants successfully highlight is the importance of contextualizing each determination, including this one. Each of these scenarios include different factors that would need to be carefully considered before determining whether they constitute "pollution," even though they may involve the same substance. But those factors are not at issue here and this decision should be understood to be limited to the circumstances of this case. It is possible to conceive of many situations in which saltwater is not commonly thought of as pollution, but after examining the circumstances here in light of California law, the Court concludes that the widespread flooding of a substantial amount of saltwater/brine from a commercial process pond onto adjacent agricultural land is decidedly what is "commonly thought of as pollution" and "environmental pollution" under MacKinnon and thus the damage caused by

it is excluded from coverage by the pollution exclusion in COG's policies.

Accordingly, the Court grants summary judgment on Plaintiffs' complaint for declaratory relief.

### C.    Defendants' Counter-Claim

#### 1.    First Cause of Action — Breach of Contract

As Plaintiffs have demonstrated that COG's policies provide no coverage for the type of property damage that occurred, it follows that Plaintiffs cannot be held liable to Defendants for breach of contract. "The insurer . . . need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." Great Western Drywall, Inc. v. Interstate Fire & Cas. Co., 74 Cal. Rptr. 3d 657, 662 (Ct. App. 2008), (citing Montrose, 6 Cal. 4th at 300). Since COG had no insurance coverage for its acts of pollution, Plaintiffs cannot be held in breach of contract to COG or Defendants. See Cold Creek Compost, Inc., 68 Cal. Rptr. 3d at 222 (affirming trial court ruling that "since Cold Creek had no insurance coverage for its acts of pollution, State Farm cannot be held in breach of contract under either the business or umbrella policies nor can it be held in violation of . . . unfair business practices.")

#### 2.    Second Cause of Action — Breach of the Implied Covenant of Good Faith and Fair Dealing

In turn, because there was no breach of contract, there was also no breach of the implied covenant. Without coverage, there can be no liability for bad faith on the part of the insurer. Everett v. State Farm General Ins. Co., 75 Cal. Rptr. 3d 812, 824 (Ct. App. 2008). "It is clear that if there is no potential for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer.

Waller v. Truck Ins. Exchange, Inc., 44 Cal. Rptr. 2d 370, 390 (1995).  Thus, Plaintiffs cannot be found liable on Defendants' first or second causes of action.

### 3.    Third Cause of Action — Direct Action for Recovery of Judgment

Similarly, Plaintiffs cannot be found liable on Defendants' third cause of action, a direct action for recovery of a judgment under California Insurance Code § 11580, as judgment creditors.  According to Wright v. Fireman's Fund Ins. Co., 11 Cal. App. 4th 998, 1015, California Insurance Code § 11580 requires that a third party claimant bringing a direct action against an insurer plead and prove the following:

> "(1) it obtained a judgment for bodily injury, death, or property damage, (2) the judgment was against a person insured under a policy that insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal, (3) the liability insurance policy was issued by the defendant insurer, (4) the policy covers the relief awarded in the judgment, (5) the policy either contains a clause that authorizes the claimant to bring an action directly against the insurer or the policy was issued or delivered in California and insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal."

Defendants are unable to prove the fourth requirement, that COG's policies cover the relief awarded in the judgment.

Therefore, the Court grants summary judgment in favor of Plaintiffs on the counter-claim brought by Defendants.

## <u>ORDER</u>

Based on the above memorandum opinion, the Court ORDERS that:

1.     Plaintiffs' motion for summary judgment on its complaint for declaratory relief is GRANTED; and

2.     Plaintiffs' motion for summary judgment on Defendants' counter-claim is GRANTED.

IT IS SO ORDERED.

**Dated:      July 10, 2008**                               **/s/ Anthony W. Ishii**
                                      CHIEF UNITED STATES DISTRICT JUDGE

21